UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NORTH CANTON BOARD OF EDUCATION, aka North Canton City School District Board of Education, ) ) ) ) | CASE NO. 5:16-cv-1420 |
| PLAINTIFF, ) ) | JUDGE SARA LIOI |
| vs. ) ) | **MEMORANDUM OPINION AND ORDER** |
| AT&T INC., et al., ) ) | |
| DEFENDANTS. ) | |

Before the Court is the Rule 12(b)(2) and 12 (b)(6) motion to dismiss filed by defendants AT&T, Inc. ("AT&T"), New Cingular Wireless PCS, LLC ("Cingular Wireless"), and NCWPCS MPL 30-Year Sites Tower Holdings, LLC ("Tower Holdings") (collectively, "defendants"). (Doc. No. 10 ["Mot."].) Plaintiff North Canton Board of Education ("the District" or "plaintiff") has filed a memorandum in opposition (Doc. No. 21 ["Opp'n"]), and defendants have filed a reply (Doc. No. 22 ["Reply"]). For the reasons set forth herein, the motion is **granted in part and denied in part**.

## I. BACKGROUND

On May 6, 2016, the District filed a complaint against defendants in Stark County Court of Common Pleas asserting claims under Ohio common law for breach of contract, tortious interference with contract, breach of fiduciary duty, civil conspiracy, and accounting. Defendants removed the case to this Court on June 10, 2016, on the basis of diversity of citizenship. 28 U.S.C. § 1332.

The complaint (Doc. No. 1-1 ["Compl"][1]) alleges that, on or about May 25, 2005, the District entered into a lease agreement ("the Lease") with AT&T (alleged to be the parent company of Cingular Wireless and Tower Holdings) that enabled AT&T to install on the District's property a pole designed to support antenna equipment and transmission wires for wireless communications signals ("the Premises"). (Compl. ¶¶ 2, 13.) A copy of the Lease is attached to the complaint as Exhibit 1.[2] (*See* Doc. No. 1-1, beginning at 25.)[3] The Court notes that, despite plaintiff's allegation that AT&T was a party to the Lease, the document itself states that the Lease was between the District, as "Lessor," and Cingular Wireless, as "Lessee." (*Id.*, Introductory paragraph.)

The complaint further alleges that the Lease required payment of a monthly base rent to the District (Compl. ¶ 14), plus a specified share of revenue received by AT&T from third parties. (*Id.* ¶ 15, citing § 10 of the Lease.) Section 10 of the Lease provides as follows:

> 10.     Assignment; Sublease; Colocation.
>
> (a)     Lessee may assign this Agreement and its other rights hereunder to any person or business entity without the prior consent of Lessor.
>
> (b)     Lessee may sublease space on the Premises, including the Pole, or allow another party's use of the Premises, including the Pole, and Lessee agrees to share the rent, revenue or other consideration received from any sublessee or other party using the Premises, including the Pole, with Lessor in accordance with the following:

---

[1] The Notice of Removal contains three exhibits. Ex. A consists of the state court pleadings served on AT&T; Ex. B is the state court pleadings served on Cingular Wireless; and Ex. C is the state court pleadings served on Tower Holdings. The three exhibits are virtually identical. Therefore, throughout this ruling, for ease of reference, the Court will cite to only Ex. A (Doc. No. 1-1) as the complaint.

[2] In ruling on a motion to dismiss under Fed. R. Civ. P. 12, a court "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Ath. Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001).)

[3] All page number references are to the page identification number generated by the Court's electronic docketing system.

> (i) Lessee will remit payment to Lessor in an amount equal to twenty-five percent (25%) of the rent, revenue or other consideration received from the first sublessee or other party using the Premises, including the Pole, but not less than Five Hundred Dollars ($500.00) per month; and
>
> (ii) Lessee will remit payment to Lessor in an amount equal to fifty percent (50%) of the rent, revenue or other consideration received from the second sublessee or other party using the Premises, including the Pole, but not less than Seven Hundred Fifty Dollars ($750.00) per month.
>
> Lessee represents and warrants unto Lessor that any sublease agreement entered into between Lessee and any sub-lessee is subject to Lessor's review and reasonable approval and that Lessee will require any sublessee to attorn to and be obligated under this Agreement in the same manner as Lessee is so obligated. Lessee acknowledges that a sublease includes any form of colocation by an entity on the Premises.

(Doc. No. 1-1 at 29.)

The Lease was amended on July 29, 2013 ("the First Amendment"), to permit installation of an additional cell tower. A copy of the First Amendment is attached to the complaint as Exhibit 2. (*See* Doc. No. 1-1, beginning at 44.) Again, the Court notes that, despite plaintiff's allegation that the parties to the First Amendment were the District and AT&T, the document identifies the parties as the District and Cingular Wireless. (*Id.*)

Space on the Premises was allegedly leased to third parties T-Mobile and Verizon, who paid for the right to co-locate on the site. (Compl. ¶ 18.) The District alleges that AT&T did not timely and accurately pay the District its rightful share of the revenue under § 10 of the Lease, despite repeated notice from the District, which included notice of default and reservation of rights to terminate the Lease, to accelerate the lease payments, and to exercise the District's right of first refusal to acquire the cell towers on the Premises. (*Id.* ¶¶ 19-20.)

Allegedly in an effort to avoid termination of the Lease, AT&T executed a Second Amendment to the Lease. (*Id.* ¶ 21.) A copy of the Second Amendment is attached to the complaint as Exhibit 3. (*See* Doc. No. 1-1, beginning at 66.) Although it appears that the District approved the Second Amendment on March 11, 2015, and Tower Holdings (the successor in interest to Cingular Wireless) approved it on June 17, 2015 (*Id.* at 68, 69), the document says it was effective on an unspecified day in June, 2014. (*Id.* at 66.) As before, despite the District's allegation that AT&T was a party to the Second Amendment, the document identifies the parties as the District and Tower Holdings. (*Id.*) The Second Amendment continued to require payment to the District of a share of rent, revenue, or other consideration, in addition to attorney fees, expert fees, costs of suit, and court costs in the event of a default. (Compl. ¶ 23.) The Second Amendment also provided for a late fee, with interest, on delinquent amounts. (*Id.* ¶ 24.)

The gravamen of this lawsuit is contained in ¶¶ 25 to 41 of the complaint. There, plaintiff alleges a scheme on AT&T's part designed to evade paying the District its fair share of revenues earned on the Premises.

The complaint alleges that, on or about October 19, 2013,[4] AT&T entered into a Master Agreement with Crown Castle International Corp. ("Crown") under which Crown agreed to lease from AT&T more than 9,000 cell towers, including the Premises. (*Id.* ¶ 25-26.) A copy of this Master Agreement is attached to the complaint as Exhibit 4. (*See* Doc. No. 1-1, beginning at 73.) Despite allegedly receiving approximately $4.85 billion of rent, revenue, or other consideration from Crown's use of the cell towers, AT&T has refused to pay any revenue sharing to landowners, such as the District. (Compl. ¶¶ 27, 28.)

---

[4] The date on the actual document is October 18, 2013.

4

Plaintiff alleges that the Master Agreement was intentionally drafted in a way to evade the revenue-sharing obligations of the Lease and its Amendments. In particular, under § 4.8(a) of the Master Agreement, if a landowner such as the District demanded payment of revenue shares, Crown was to recharacterize that landowner's site as a "Managed Site" rather than a "Leased Site." (*Id.* ¶ 33.) Even so, the Master Agreement also provides that all sites must be treated as leased sites for income tax purposes and all so-called "Managed Sites" must be operated "in a manner consistent with" operation of "Leased Sites." (*Id.* ¶¶ 35, 37, 39.) The District alleges that its Lease and the Amendments require revenue sharing for any rent, revenue or other consideration received by AT&T relating to the Premises, regardless of how the Premises are labeled. (*Id.* ¶¶ 40-41.)

Defendants filed their motion to dismiss on July 15, 2016; it included a challenge to personal jurisdiction. (*See* Mot. § III.A.) Shortly thereafter, plaintiff moved for leave to conduct limited discovery relating to personal jurisdiction. Following telephone conferences with the Court and counsel, the matter was referred to the assigned magistrate judge for resolution. On September 9, 2016, defendants voluntarily withdrew the portion of their motion to dismiss that had challenged personal jurisdiction over AT&T. (*See* Notice of Voluntary Withdrawal, Doc. No. 18.) Therefore, this ruling will not address personal jurisdiction, that matter having now been waived.[5]

---

[5] The notice of voluntary *withdrawal* does not expressly state that it *waives* a challenge to personal jurisdiction. Rather, it states that AT&T is unwilling to devote the extended time to discovery on the issue that plaintiff had requested, deeming it to be a waste of time given what AT&T believes are strong legal arguments for its dismissal on the merits. To be clear, however, especially in view of this ruling on the motion to dismiss, the Court has construed Doc. No. 18 as a waiver of personal jurisdiction by AT&T. *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006) ("The requirement that a court have personal jurisdiction is a due process right that may be waived either explicitly or implicitly.") (internal quotation marks and citations omitted).

## II. DISCUSSION

**A.     Standard on a Motion to Dismiss**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id*. at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570).[6] Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678-79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

---

[6] The Court notes that here, where jurisdiction is based on diversity and all the claims are raised under Ohio common law, the Court applies the substantive law of Ohio to determine whether a particular claim has been stated. *City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (citations omitted).

**B.     Analysis**

  **1.     Failure to State a Claim Against AT&T for Breach of Contract**

In Count One of the complaint, the District alleges a breach of contract claim against all three defendants, including AT&T, who is not a party to the Lease, the First Amendment, or the Second Amendment. AT&T argues that the breach of contract claim against it must fail as a matter of law.

The District concedes in its brief that AT&T is not a party to the relevant contracts. (Opp'n at 877.) It argues, however, that "in discovery, [it] expects to obtain evidence that AT&T orchestrated efforts to misrepresent facts in the negotiations of the Lease Amendments relied upon by the [District]." (*Id.*) It claims that "'courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.'" (*Id.* at 875, quoting *Kovach v. Access Midstream Partners, L.P.*, No. 5:15-cv-616, 2016 WL 1162061, at * 7 (N.D. Ohio Mar. 23, 2016).)

While the District's argument that it should be allowed to flesh out a claim through discovery might be applicable to another claim, it offers no support with respect to Count One, to the extent that count is leveled against AT&T. AT&T is simply not a party to any of the agreements and no amount of discovery, even of material that may be within AT&T's sole control, is going to change that fact. The documents speak for themselves. As correctly argued by AT&T, "[w]here, as here, a written instrument contradicts the allegations of the complaint to which it is attached, the written instrument trumps the allegations." (Mot. at 743, citing *Creelgroup, Inc. v. NGS American, Inc.*, 518 F. App'x 343, 347 (6th Cir. 2013).)

The Court agrees with AT&T and, to that extent, its motion to dismiss is granted. The breach of contract claim in Count One shall proceed only against Cingular Wireless and Tower Holdings.

### 2. Failure to State a Claim for Breach of Fiduciary Duty

In Count Two, plaintiff claims that defendants "assumed the role of fiduciaries to the [District], with respect to revenue sharing under the Lease and Amendments[,]" that "AT&T had sole access and knowledge concerning the rent, revenue or other consideration received from third parties' use of the Premises[,]" and that the District "placed special confidence and trust in the integrity and fidelity of AT&T, and there was a resulting position of superiority that AT&T acquired by virtue of this special trust of which AT&T was aware." (Compl. ¶¶ 53, 54, 55.) The District alleges that AT&T "had a duty to disclose . . . all information relating to rent, revenue or other consideration that AT&T received from third parties' use of the Premises[,]" that AT&T "failed to disclose" with respect to that duty, and that it "materially misrepresented . . . the nature of the AT&T-Crown transaction and falsely represented . . . that it did not receive any rent, revenue or other consideration from Crown related to the Premises." (*Id.* ¶¶ 56, 57, 58.)

Defendants argue, first, that it is a basic tenet of Ohio law that a party cannot convert a contract action into a tort action. (Mot. at 744, citing *Ketcham v. Miller*, 136 N.E. 145 (Ohio 1922) and *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 705 (Ohio 2005).) Further, it is not a tort to breach a contract, regardless of motive. (*Id.*, citing cases.)

Defendants also argue that the District has alleged no facts upon which the Court could conclude that defendants owed the District a special duty, outside the terms of the contract. They claim that the only duties owed by Cingular Wireless and Tower Holdings arose from the contracts,

and that AT&T, a non-party to any contract, had no relationship with the District that would give rise to a fiduciary duty. (Mot. at 746-47.)

In opposition, the District asserts that it was in a "quasi-partnership [with Cingular Wireless] for purposes of equally sharing revenue generated by the tower sites." (Opp'n at 877.) It argues that it was induced to enter into the First Amendment based on "the express representation that [it] would continue to share 50% of the revenue generated from third parties." (*Id.*, footnote omitted.) The District "expand[ed] the size of the leased premises, add[ed] a second cell tower, and extend[ed] the initial term of the lease[,]" in return for an agreement to "cooperate in efforts to obtain additional rent, revenue or other consideration from third parties' use of the site." (*Id.* at 877-78.) The District claims that, unbeknownst to it, "at the same time it was induced to execute the First Amendment with the representation of increased revenue, AT&T was devising a scheme to evade such revenue sharing obligations by executing the Master Agreement[.]" (*Id.* at 878.) The District claims that, after AT&T formed Tower Holdings, it required Cingular Wireless "to contribute its interest in the [District's] real estate to Tower Holdings." (*Id.*) The District asserts that "AT&T crafted a scheme to defraud landowners who had leases with revenue sharing provisions." (*Id.* at 879.) This, according to the District, "created a de facto fiduciary relationship between the parties." (*Id.* at 881.)

The District argues that defendants held a special, and superior, position that caused the District to place special trust in them when entering into their contracts. The problem with this argument is that, as to Cingular Wireless and Tower Holdings, any duty owed to the District arises *only* from the terms of the contracts. There would be no duty to the District but for the contracts and they do not give rise to any separate fiduciary duty. As explained by the Sixth Circuit:

9

> A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing. The Texas Supreme Court described this distinction in *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex. 1992):
>
>> The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.
>> …
>> The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship.

*In re Sallee*, 286 F.3d 878, 891-92 (6th Cir. 2002) (quoting *Crim Truck & Tractor Corp.*, 823 S.W.2d at 594-95) (internal citations omitted in original).

As to AT&T, it had no contractual duty, not being a party to the contracts, and, since it had no other relationship with the District, the Court is hard pressed to see how there could be an independent fiduciary duty to plaintiff. Even though, as the District argues, the allegations of the complaint should be accepted as true (Opp'n at 882), that applies to *factual* allegations. The mere allegation of a de facto fiduciary relationship, which is a question of law, *Ivancic v. Enos*, 978 N.E.2d 927, 939 (Ohio Ct. App. 2012), does not require this Court, on a motion to dismiss, to accept that *legal* assertion as true. There are *no* facts in the complaint that would support a conclusion that the District and AT&T had *any* relationship, much less a fiduciary relationship.

Defendants are entitled to dismissal in its entirety of the claim of breach of fiduciary duty in Count Two.

### 3. Failure to State a Claim for Tortious Interference with Contract

Tortious interference with contract occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person . . . not to perform a contract with another." *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995) (citations omitted). Defendants argue that both the Sixth Circuit and the Northern District of Ohio have held that "a parent company is privileged to interfere with its subsidiary's contract because it is considered the same as the subsidiary." (Mot. at 747, quoting *Wamen v. Goodyear Tire & Rubber Co.*, No. 5:13CV1084, 2014 WL 185901, at *6 (N.D. Ohio Jan. 15, 2014); *see also id.* n.6 (citing *Canderm Pharm., Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988); *Kirk v. Shaw Envtl., Inc.*, No. 1:09-cv-1405, 2010 WL 1387887, at *8 (N.D. Ohio Mar. 31, 2010); *Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 841-42 (N.D. Ohio 2013); *ITS Fin., LLC v. Advent Fin. Servs., LLC*, 823 F. Supp. 2d 772, 783-84 (S.D. Ohio 2011); *Neely v. Crown Solutions Co., LLC*, No. 3:13-cv-00109, 2013 WL 6056205, at *16 (S.D. Ohio 2013)).)

In opposition, the District argues that, although the Ohio Supreme Court has not decided the issue of whether a parent may be held liable for interference with a subsidiary's contract, an Ohio appellate court has very recently addressed the issue. The District cites *Paramount Farms Int'l., L.L.C. v. Ventilex B.V.*, 61 N.E.3d 702 (Ohio Ct. App. 2016), for the proposition that the parent's relationship to its subsidiary is "but one of the several factors" that must be considered under Restatement (Second) of Torts § 767 (1979), which "the Ohio Supreme Court has adopted . . . [as] guidelines to be followed in determining whether an actor's interference with another's contract is improper." (Opp'n at 886, quoting *Paramount Farms*, 61 N.E.3d at 710.) According to *Paramount Farms*,

11

> a court determining whether an actor's interference with a contract was improper or "privileged" should consider the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

61 N.E.3d at 710 (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999)). Ohio's Twelfth District Court of Appeals expressly declined to follow *Canderm*, *Kirk*, and *ITS Financial* (all relied upon by defendants here), concluding that "[a]lthough the decisions speak directly to the issue at bar, none of the decisions cite an opinion from an Ohio court explicitly [supporting their underlying reasoning]." *Id.* at 709.

In their reply brief, defendants assert that *Paramount Farms* is an "aberrational unreported decision" that should not take precedence over "controlling precedent from the Sixth Circuit and Northern District of Ohio[.]" (Reply at 909.) In the alternative, defendants argue that, even if this Court were to apply *Paramount Farms*, plaintiff's tortious interference claim would still fail as a matter of law because plaintiff "alleges no facts demonstrating that the alleged interference was improper or that AT&T Inc. caused Cingular Wireless/Tower Holdings to breach the Lease Agreement." (*Id.* at 911, footnote omitted.)

The dilemma here is how to interpret Ohio law where earlier federal decisions interpreting that same law, which might otherwise guide this Court, have been expressly rejected by the later decision of an Ohio intermediate appellate court. The Court concludes that it must simply continue to apply the basic legal principles that it would apply were it writing on an entirely clean slate.

Where the Ohio Supreme Court has not spoken on an issue of state law, the task confronting a federal court addressing that issue "is to make the best prediction of what the state court would do if confronted with the question." *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618,

624 (6th Cir. 2008) (citation omitted). "State appellate court decisions are generally authoritative, 'absent a strong showing that the state's highest court would decide the issue differently.'" *Id.* (quoting *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 2008)); *see also In re Nowak*, 414 B.R. 269, 276 (Bankr. S.D. Ohio 2009) (the court may rely upon "opinions of the State's intermediate appellate courts to the extent that they are persuasive indicia of the State Supreme Court direction"). "While engaged in [the] predictive process, '[t]he Court must employ the appropriate [state] methodology to decide this issue the way that [it] believe[s] the Supreme Court of [the state] would decide it." *Id.* (alterations in original; all internal quotation marks and citations omitted).

The court in *Paramount Farms* carefully evaluated the Ohio Supreme Court's adoption of Section 767 of the Restatement of Torts, providing guidelines for determining whether a party's interference is proper or not. It cited comments under Section 767, which state that the factors listed in the section are "to be weighed against each other and balanced in arriving at a judgment[,]" as to whether interference was proper or not, that "[t]he weight carried by these factors may vary considerably and the determination of whether the interference is improper may also vary; but *the listed factors are nevertheless important*[.]" *Paramount Farms*, 61 N.E.3d at 710 (emphasis added). The court concluded that concentrating solely on the "relations between the parties" to the exclusion of all the other elements "elevate[s] the parent company/subsidiary relationship to a super, threshold factor, the presence of which precludes the consideration and weighing of the various Section 767 factors." *Id.* at 711.

Notwithstanding the various federal cases that previously decided this issue differently, this Court is persuaded that the decision in *Paramount Farms* should now be controlling on this issue of state law, given that it is a decision of an intermediate appellate court in Ohio that relies

13

upon Ohio authority, that it provides "persuasive indicia of the State Supreme Court direction," and that it expressly rejected the previous federal court rulings on the issue.

Although defendants urge the Court to follow the federal decisions rejected by *Paramount Farms*, and although they label *Paramount Farms* as "aberrational," they do not explain how its reasoning is incorrect in light of Ohio law. Where an Ohio intermediate appellate court has spoken with respect to Ohio law, and has done so in a reasoned manner, this Court, when applying that same Ohio law, must be guided by the Ohio appellate court, not by other federal courts[7] attempting to interpret Ohio law.

Although the claims asserted against AT&T in Count Three are barely above conclusory, given the standard that the Court is required to apply when deciding a motion to dismiss, the Court finds that AT&T is not entitled to dismissal as a matter of law of the claim of tortious interference with contract. Given the test sited in *Paramount Farms* that may apply to this claim, the Court has determined that this issue is best reserved for determination at a later stage of the proceedings.[8]

---

[7] The Court also notes that defendants point to a 2014 decision by the undersigned as authority for dismissal of Count Three. *See Wamen v. Goodyear Tire & Rubber Co.*, *supra*. *Wamen* was decided before *Paramount Farms*, and it relied upon the same three federal cases (*Canderm*, *Kirk*, and *ITS Financial*) that *Paramount Farms* expressly rejected. (In fact, *Paramount Farms* also rejected *Wamen*. 61 N.E.3d at 709 n.2.) Therefore, the Court does not feel constrained to rule in the same way as it ruled in *Wamen*, having been now convinced that an Ohio appellate Court, interpreting Ohio law, decided the issue differently. In addition, although this Court determined in *Wamen* that the tortious interference claim should be dismissed for the alternative reason that plaintiff had failed to allege that the parent's and the subsidiary's interests were not aligned, that same argument raised by defendants here (*see* Reply at 911-12) is not persuasive, given the procedural posture of the case and the possibility of amending the pleadings, a possibility suggested by plaintiff's opposition brief arguing that, in implementing the Master Agreement with Crown, AT&T acted in its own interests and not in the interest of Tower Holdings. Finally, *Wamen* is also distinguishable for its additional finding that there was no contract and/or no breach and, therefore, there could be no tortious interference.

[8] Although the Court feels constrained to retain Count Three at this juncture, it is hard-pressed to see how the allegations of the complaint suggest that AT&T interfered with the Lease between the District and Cingular Wireless/Tower Holdings. In particular, if the District is correct that the Lease, as twice amended, requires revenue sharing for any rent, revenue or other consideration received relating to the Premises (Compl. ¶ 40), and entitles the District to share with Cingular Wireless/Tower Holdings any revenues earned by the latter from the Premises (notwithstanding their characterization by the Master Agreement as "managed") (*id*. ¶ 41), then there has been no interference by AT&T, even though there may have been a breach of contract by Cingular Wireless/Tower Holdings due to failure to pay.

That said, it goes without saying that defendants Cingular Wireless and Tower Holdings, as parties to the contracts, "cannot be sued in tort for interfering with [their] own performance." *Contadino v. Tilow*, 589 N.E.2d 48, 52 (Ohio Ct. App. 1990) (citing *Battista v. Lebanon Trotting Ass'n*, 538 F.3d 111, 116 (6th Cir. 1976) ("a party to a contract cannot be liable in tort for inducing his own breach[]")). Although the allegations in Count Three of the complaint are only directed against AT&T, since the District's prayer seeks damages against all defendants for all counts, the Court finds it necessary to clarify that Count Three will proceed only against AT&T.

### 4. Failure to State a Claim for Civil Conspiracy

In Count Four of the complaint, the District specifically alleges that "[d]efendants have maliciously combined, colluded, and conspired, . . . to perpetuate the breach of fiduciary duty and other unlawful acts against the [District] and other similar landowners." (Compl. ¶ 69.)

The tort of civil conspiracy is defined as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 867 (Ohio 1995) (internal quotation marks and citations omitted). "[A]n underlying unlawful act is required before a civil conspiracy claim can be successful." *Gosden v. Louis*, 687 N.E.2d 418, 496 (Ohio Ct. App. 1996) (citing *Minarik v. Nagy*, 193 N.E.2d 280, 280-81 (Ohio 1963)). "[T]he underlying unlawful act must be a tort." *Avery v. Rossford, OH Transp. Improvement Dist.*, 762 N.E.2d 388, 395 (Ohio Ct. App. 2001). Further, "[t]he conspiracy claim must be pled with some degree of specificity, and vague or conclusory allegations that are unsupported by material facts will not be sufficient to state a claim." *Id.*

15

Here, as pointed out by defendants, the District's civil conspiracy claim is pleaded based on an alleged underlying claim of breach of fiduciary duty. Since that claim has been dismissed, defendants assert that there is no basis for the conspiracy claim.

Plaintiff argues in its opposition that the conspiracy claim can be based upon either the breach of fiduciary duty claim or the tortious interference with contract claim. But, plaintiff has not pleaded the conspiracy based on anything other than breach of fiduciary duty. Even if ¶ 69 of the complaint were amended to allege: "[d]efendants have maliciously combined, colluded, and conspired, . . . to perpetuate the tortious interference with contract and other unlawful acts against the [District] and other similar landowners[,]" the conspiracy claim could not survive. As explained in *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at * 19 (Ohio Ct. App. July 2, 1999), a cause of action for conspiracy to tortiously interfere with a contractual relationship "must involve two or more nonparties [to the agreement] conspiring to induce a party to breach his contract." This is because "[i]t makes no sense to say that a party conspired to induce [itself] to breach a contract." *Id.*

Defendants are entitled to dismissal of the civil conspiracy claim in Count Four.

### 5. Failure to State a Claim for Accounting

In Count Five of the complaint, the District seeks "a full accounting from [d]efendants of all monies [d]efendants received in connection with the Premises." (Compl. ¶ 74.) Defendants argue that an accounting is not an independent cause of action, and seek dismissal of Count Five. They also seek dismissal of any prayer for an accounting, since the District has failed to allege that there is no adequate remedy at law. (Mot. at 753.)

"Under Ohio law, 'where there is an adequate remedy at law, an equitable remedy is improper.'" *Skurka Aerospace, Inc. v. Eaton Aerospace, L.L.C.*, No. 1:08CV1565, 2011 WL

16

1134591, at * 3 (N.D. Ohio Mar. 25, 2011) (quoting *McNulty v. PLS Acquisition Corp.*, Nos. 79025, 79125, 79195, 2002 WL 31875200, ¶ 80 (Ohio Ct. App. Dec. 26, 2002)).

The District has not opposed this portion of defendants' motion and, thus, has conceded the point. Even had the District not conceded the point, defendants' motion is well taken and, therefore, Count Five is dismissed.

### 6. Failure to State a Claim for Punitive Damages

In four of the five claims, plaintiff requests punitive damages, allegedly based upon conduct "with actual malice and/or with a reckless disregard" for plaintiff's rights. (Compl. ¶¶ 51, 62, 67, 71.) Defendants assert that these requests fail because there are no underlying tort claims and one cannot recover punitive damages in an action for breach of contract. (Mot. at 753-54.)

In opposition, plaintiff argues that punitive damages are available for tort claims upon a showing of actual malice, and are available for a breach of contract claim if the breach is "accompanied by a connected, but independent[,] tort involving fraud, malice or oppression." (Opp'n at 893, quoting *McMahon v. Alternative Claims Serv., Inc.*, 521 F. Supp. 2d 656, 661 (N.D. Ohio 2007) (further citation omitted) (alteration added).)

In Ohio, punitive damages are available only upon a showing of actual malice. *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 419 (Ohio 1991). "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987) (Syllabus).

The bare allegations of "actual malice" repeated in the four cited paragraphs of the complaint are, by themselves, insufficient under the *Twombly/Iqbal* standard of pleading to survive

a motion to dismiss. But, under Ohio law, punitive damages need not be specially pleaded or claimed. *Brookridge Party Ctr., Inc. v. Fisher Foods, Inc.*, 468 NE.2d 63 (Ohio Ct. App. 1983). Plaintiff must, however, "allege facts in the complaint from which the essential element of malice may be inferred." *Bell v. Joecken*, No. 20705, 2002 WL 533399, at *1 (Ohio Ct. App. Apr. 10, 2002) (citing *Columbus Fin., Inc. v. Howard*, 327 N.E.2d 654 (Ohio 1975); *Candler v. Ash*, 372 N.E.2d 617 (Ohio Ct. App. 1976)). If there are no facts in the complaint to support an inference of malice, plaintiff must amend the complaint. *Id*. (citing *Lambert v. Shearer*, 616 N.E.2d 965, 969-70 (Ohio Ct. App. 1992)).

Here, although there are some allegations that AT&T acted in an attempt to evade the revenue-sharing obligations of the Lease (Compl. ¶¶ 30, 35, 39) or acted intentionally to conceal from the District that it owed revenue-sharing amounts (*id*. ¶¶ 31, 65), there are no allegations that permit an inference of actual malice as that is defined by Ohio law.

Accordingly, although the Court finds that the District has failed to adequately plead facts that would entitle it to punitive damages, it will grant the District leave until seven (7) days after the date of this order to amend its complaint to add sufficient allegations to support a punitive damages claim with respect to the remaining tort claim in Count Three.[9]

### III. CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss (Doc. No. 10) is granted in part and denied in part.

---

[9] There is no basis for a claim of punitive damages relating to Count One.

Counts Two, Four and Five are dismissed as to all defendants. Count One is dismissed as to defendant AT&T and will proceed as to the other two defendants. Count Three is dismissed as to defendants Cingular Wireless and Tower Holdings and will proceed only as to defendant AT&T.

The claim for punitive damages as it relates to Count Three will be dismissed unless plaintiff files, within 7 days of the date of this order, an amended complaint that sufficiently pleads facts to support an inference of actual malice.

**IT IS SO ORDERED**.

Dated: March 27, 2017

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**