# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NORTH CANTON BOARD OF EDUCATION, | ) ) | CASE NO. 5:16-cv-1420 |
| | ) | |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION** |
| AT&T, INC., et al., | ) ) | **AND ORDER** |
| DEFENDANTS. | ) ) | |

Before the Court are the following fully-briefed motions: (1) the motion for summary judgment filed by defendants New Cingular Wireless PCS, LLC ("NCW") and NCWPCS MPL 30-Year Tower Holdings, LLC ("Tower Holdings") (collectively, "defendants") (Doc. No. 93 ("MSJ")[1]), and (2) the motion for partial summary judgment filed by plaintiff North Canton Board of Education (the "District") (Doc. No. 95 ("MPSJ")[2]). For the reasons set forth herein, plaintiff's motion is denied and defendants' motion is granted.

## I.     PROCEDURAL BACKGROUND

On May 6, 2016, the District filed a complaint in the Court of Common Pleas of Stark County, Ohio against AT&T, Inc. ("AT&T"), NCW, and Tower Holdings, which defendants removed to this Court on June 10, 2016, alleging diversity jurisdiction. (Doc. No. 1.) The complaint was amended on April 3, 2017. (Doc. No. 27 (First Amended Complaint ["FAC"]).)

The three defendants moved to dismiss the FAC for failure to state a claim. On October 5, 2017, this Court granted the motion to dismiss, in part, resulting in dismissal of Count Two of the

---

[1] Doc. No. 107, Plaintiff's Response in Opposition ("MSJ Opp'n"); Doc. No. 108, Defendants' Reply ("MSJ Reply").

[2] Doc. No. 104, Defendants' Opposition ("MPSJ Opp'n"); Doc. No. 110, Plaintiff's Reply ("MPSJ Reply").

FAC, along with defendant AT&T. (Doc. No. 41 (Memorandum Opinion and Order).) Only Count One for breach of contract against NCW and Tower Holdings[3] currently remains.

## II. FACTUAL BACKGROUND

The sole remaining claim[4] in this lawsuit turns on interpretation of a lease agreement executed by the parties on May 25, 2005, which was subsequently amended twice. The District's claim is that the defendants breached Section 10(b) of the lease agreement by failing to remit to the District 50% of the "rent, revenue, or other consideration" from a transaction between AT&T and Crown Castle International Corporation.

### A. The Lease Agreement and the First Amendment to the Lease Agreement

Under the lease agreement, NCW was permitted to construct on the District's "Premises" a cellular tower (defined in the agreement as a "Pole") for transmitting and receiving wireless communications signals. (Doc. No. 93-2, Lease Agreement[5] ("Original Lease"), §§ 1(E),(F), 2 and 7.) In addition to the $70,000 NCW paid the District for the right to construct the cellular tower, it also agreed to pay a monthly rent (*id.* § 5) for:

> a non-exclusive license to use the Premises for (i) the installation, operation, maintenance, repair, replacement and relocation of all of the Equipment comprising the Cell Site and (ii) for the transmission and reception of communication signals pursuant to all rules and regulations of the Federal Communications Commission ("FCC").

---

[3] NCW and Tower Holdings are both "part of the AT&T family of companies." (Doc. No. 44, Answer of NCW, ¶¶ 2, 3; Doc. No. 45, Answer of Tower Holdings, ¶¶ 2, 4.) Neither defendant is arguing lack of privity with respect to the Master Agreement discussed herein.

[4] The District claims it has preserved other matters for trial. This is discussed separately below.

[5] There are several copies in this record of the various agreements and documents discussed herein. For consistency, the Court has chosen to cite throughout this opinion to the copies attached to defendants' motion for summary judgment.

(*Id.* § 3.) NCW had the right to "assign this Agreement and its other rights hereunder to any person or business entity without the prior consent of [the District]." (*Id.* § 10(a).)

NCW agreed to construct the cellular tower so it had a capacity "for up to two (2) additional wireless communications service providers." (*Id.* § 1(E).) This was necessary to comply with North Canton zoning regulations under which, to obtain a conditional use permit for a telecommunications tower in the city, the property owner where the tower would be installed had to present written documentation to the planning commission showing that it had agreed to "collocation," that is, "[t]he use of a wireless telecommunications facility by more than one wireless telecommunications provider." (Doc. No. 93-4, North Canton Zoning Ordinance § 1157.02(a).) NCW and the District agreed to share the monthly revenue generated by any collocation. (Original Lease § 10(b).[6])

NCW also agreed to "keep and maintain the Premises [at its expense] in commercially reasonable condition and repair during the Term of this Agreement." (*Id.* § 7(c).) The District's Director of Business, Raymond Nist ("Nist"), understood that NCW could meet these obligations by hiring third-party contractors. (Doc. No. 97-1, Deposition of Raymond Stephen Nist[7] ("Nist Dep.") at 5317.[8])

On July 29, 2013, the parties entered into an amendment to the lease agreement, under which NCW was permitted to build a second cellular tower. (Doc. No. 93-8, First Amendment to Lease Agreement (the "First Amendment") (together with Original Lease—the "Lease").) The

---

[6] It is this revenue-sharing provision (as later amended by the parties) that the District claims is being breached by defendants.

[7] Although excerpts of various depositions were submitted with the motions, the Court will cite to the full deposition transcripts in the record.

[8] All page number references are to the page identification number generated by the Court's electronic docketing system.

ground rent was increased, and NCW prepaid the first $25,000 of such rent. (*Id.* § 4.) The term "Pole" in the Original Lease was deleted and replaced with a new definition that encompassed "two (2) antenna structures located at the Premises[.]" (*Id.* § 6.) The first—known as the "Flag Pole"—accommodated "up to two (2) additional wireless communications service providers[,]" and the second—known as the "Monopole"—would accommodate "at least one (1) additional wireless communications service provider[.]" (*Id.*) The parties also modified the revenue-sharing requirements to reflect the additional capacity. (*Id.* § 7.)

### B. The AT&T–Crown Castle Transaction

On October 18, 2013, AT&T (and its subsidiaries, which include defendants here[9]) entered into a Master Agreement with Crown Castle International Corporation ("Crown") (and its subsidiaries). Crown was in the business of cellular tower management; it did not provide cellular service. (Doc. No. 99-1, Deposition of Vicky Davis ("Davis Dep.") at 6997.) Defendants assert that the "deal involved transferring rights to over 9,700 towers with a variety of different lease/contractual arrangements with the various landowners[,]" (MSJ at 3106), but with the same general purpose: "the AT&T entity with telecommunications equipment on the tower would keep its equipment on the tower and a [Crown] entity would take over management of the cellular site, *i.e.*, maintaining the towers (but not the telecommunications equipment) and paying the landowner the ground rent and any revenue sharing due for collocators." (*Id.*)

Under this Master Agreement, Crown formed a limited liability company (the "Tower Operator"—CCATT here[10]) that would "enter into a management agreement . . . to operate each

---

[9] *See* n.3, *supra*.

[10] Doc. No. 91-1, Deposition of Steven Viron ("Viron Dep.") at 2411. Steven Viron was NCW's Rule 30(b)(6) deponent. (*Id.* at 2244.)

Managed Site (including the Included Property thereof) … ." The Tower Operator was to "market all available capacity at the [relevant] [s]ites [including the District's site] . . . and [ ] maximize the collocation revenue that may be derived therefrom[.]" (Doc. No. 93-9, Master Agreement ("Master Agreement") at 3227 (3rd & 6th Recitals).)

AT&T and the Tower Operator entered into (1) a master prepaid lease for the relevant sites,[11] under which the Tower Operator leased the "included property" (as defined by the Master Agreement), with an option to purchase, and (2) a General Assignment and Assumption Agreement, under which AT&T entities conveyed certain rights and the Tower Operator assumed certain liabilities with respect to the Collocation Agreements for the relevant sites.[12] (*Id.* at 3228 (7th Recital); § 2.2(d).)[13] "Included Property" was defined as:

> (i) the Land related to [each] Site (including the applicable interest in any Ground Lease), (ii) the Tower located on such Site (including the AT&T Collocation Space) and (iii) the related Improvements (excluding AT&T Improvements and any Tower Subtenant's Improvements) and the Tower Related Assets with respect to such Site; but excluding, in each case of (i), (ii), and (iii), any Excluded Assets and all Tower Subtenant Communications Equipment.

(*Id.* at 3238.) "Excluded Assets" was further defined in some detail in the Master Agreement. (*Id.* at 3234–35.) Notably, among the excluded assets were "any and all licenses granted by the FCC or any other Governmental Authority[.]" (*Id.* at 3235.) Crown paid a lump sum in "Consideration," as defined by the Master Agreement. (*Id.* at 3233; *see also id.* § 3.2.)

---

[11] It appears there were also provisions for master leaseback agreements under which the AT&T Collocation Space at each site was leased back to the AT&T Collocators for their "exclusive use and possession[.]" (Master Agreement at 3228 (8th & 9th Recitals).)

[12] Notably, any such assignment that *required* authorization by a third party (*e.g.*, the District) would be ineffective if that authorization had not been obtained. (*See* Master Agreement §1.3(a), (b).)

[13] Defendants have supplied a document styled "Assignment and Assumption of Ground Leases" (Doc. No. 93-12); however, this does not appear to be the "Tower Operator General Assignment and Assumption Agreement" referenced in the seventh Recital of the Master Agreement, since it makes no reference to assignment of Collocation Agreements.

As to the District's site in particular, the AT&T-Crown Transaction included an assignment by NCW to Tower Holdings (both AT&T subsidiaries) of (1) certain rights and "all payments, terms and obligations" under the Ground Lease; (2) the "Included Property"—primarily NCW's interest in the land and the towers; and (3) the Collocation Agreements with Verizon and T-Mobile, the only two collocators at the time. (Doc. No. 93-12, Assignment and Assumption of Ground Leases; Doc. No. 93-13, AT&T Internal Transfers Agreement & Schedule 1; Doc. No. 93-14, Master Prepaid Lease at 3428 & 3431.) NCW retained, *inter alia*, its FCC licenses, its wireless communications equipment on the Towers, and the right to use its existing space on the Towers. (Master Agreement at 3238 & 3234-35; Doc. No. 93-15, MPL Site Master Lease Agreement, §§ 2(a), 9(b), 9(f).) Crown paid a lump sum, in cash, to AT&T Mobility II, LLC's bank account.

Tower Holdings then engaged CCATT to manage and discharge its obligations under the Lease, including paying the District the monthly ground rent and the revenue sharing owed from use of the Premises by collocators Verizon and T-Mobile. (*See* Doc. No. 93-16 ("Management Agreement"); Viron Dep. at 2353-54.) In exchange, CCATT obtained Tower Holdings' right to the revenue generated by the collocators' use of the Towers (as well as any additional future collocators), subject to the revenue sharing provisions under the Lease.

### C. The Second Amendment to the Lease Agreement

After CCATT began to manage the District's site, a dispute arose over the amounts allegedly not paid under the First Amendment. (Viron Dep. at 2517.) The District also claimed it was entitled to share the amount allocated to its site in the AT&T-Crown Transaction. (Doc. No. 96-1, Deposition of Owen Rarric ("Rarric Dep.") at 4953-54; Doc. No. 96-13, Rarric Dep. Ex. 12.)

To resolve their differences, in June 2015, the parties entered into a Second Amendment to the Lease Agreement (Doc. No. 93-19 (the "Second Amendment"))[14] and an Estoppel Certificate (Doc. No. 93-20 (the "Estoppel Certificate")). The Second Amendment included an acknowledgment by the District that CCATT was acting as the "attorney in fact" for Tower Holdings (Second Amendment at 3775), plus the following:

> WHEREAS, New Cingular Wireless PCS, LLC has transferred its rights and obligations under the Lease to an affiliate, NCWPCS MPL 30-Year Sites Tower Holdings, LLC, as permitted under Section 10 of the Lease; and
>
> WHEREAS CCATT manages and operates the site related to the Lease for Lessee [Tower Holdings] and is obligated to comply with the terms of the Lease[.]

(*Id.*) The parties agreed to a "Payment Reconciliation" whereby CCATT/Tower Holdings paid the District $15,133.44 of "additional rent," $34,369.52 of "additional ground rent," and $7,500.00 for "legal fees incurred[.]" (*Id.*) The Second Amendment also provided for the handling of "future defaults." (*Id*. at 3775-76.)

The Estoppel Certificate noted that the Lease, as twice amended, "constitutes the entire agreement between the parties with respect to the property subject to the Lease[.]" (Estoppel Certificate at 3782 ¶ 2.) The parties also agreed on the amount of "the current monthly ground rent due to" the District and the "current monthly compensation due to Lessor [the District] from Lessee [Tower Holdings] arising from T-Mobile and Verizon's use of the towers[.]" (*Id.* ¶ 5.)

Eleven months after executing the Second Amendment, the District filed this lawsuit.

---

[14] The opening paragraph of the Second Amendment states June 2014 as the "effective date," but the parties completed execution of the amendment in June 2015. (*See* Second Amendment at 5012, 5014.)

## III.    STANDARD ON SUMMARY JUDGMENT

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[15] Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id.* at 252.

---

[15] Apropos of this standard regarding the quality of evidence on summary judgment, defendants have filed two motions to strike: (1) motion to strike Exhibits 5 and 12 to plaintiff's motion for partial summary judgment (Doc. No. 105); and (2) motion to strike evidence from plaintiff's opposition to defendants' motion for summary judgment (Doc. No. 109). Although both of these motions were fully briefed, the Court finds no need to address them because none of the challenged evidence formed a basis for the Court's determination herein. Both motions, therefore, are denied without prejudice.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co*., 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ*., 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ*., 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks omitted) (citing *Anderson*, 477 U.S. at 247–48). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## IV.    DISCUSSION

### A.    The Contract Dispute, the Governing Law, and Contract Construction

The underlying dispute in this case is not complicated: the District claims that the defendants have breached Section 10(b) of the Lease by mischaracterizing their arrangement with CCATT as a "management agreement" so as not to have to share the revenue from that arrangement with the District. (*See generally* FAC ¶¶ 63–72; Prayer for Relief (a).) The defendants, on the other hand, are of the view that CCATT merely stepped into their shoes with respect to the towers on the District's premises. They are of the view that the District has received (and continues to receive) all that it is due and, if the District were to share in the payment exchanged between defendants and CCATT, the District would be double-dipping.

The Lease here between NCW and the District is governed by Ohio law. (Original Lease § 27(a).) Under Ohio law, a plaintiff bears the burden of establishing "the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (quoted by *Doe v. Univ. of Dayton*, No. 18-3339, 2019 WL 1224606, at *6 (6th Cir. Mar. 15, 2019)). No one disputes the existence of a contract; the dispute relates to its interpretation.

"The interpretation of a written contract, including whether the language admits of any ambiguity, is a question of law for determination by the court. Courts may not use extrinsic evidence to create an ambiguity, rather, the ambiguity must be present on the face of the contract." *Am. Aluminum Extrusions of Ohio, LLC v. Neb. Plastics, Inc.*, No. 5:09 CV 00763, 2010 WL

10

2342485, at *2 (N.D. Ohio June 8, 2010) (internal citations omitted). "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must look at the contract as a whole and "presume that the intent of the parties is reflected in the language used[.]" *Id.* "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.* "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Id.* "On the other hand, where a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." *Id.*

The particular section of the Lease that the District claims has been breached by the defendants is Section 10(b), which provides:

> (b)  Lessee may sublease space on the Premises, including the Pole, or allow another party's use of the Premises, including the Pole, and Lessee agrees to share the rent, revenue or other consideration received from any sublessee or other party using the Premises, including the Pole, with Lessor in accordance with [percentages set forth in subsections (i) and (ii).]
>
> * * *
>
> Lessee represents and warrants unto Lessor that any sublease agreement entered into between Lessee and any sub-lessee is subject to Lessor's review and reasonable approval and that Lessee will require any sublessee to attorn to and be obligated under this Agreement in the same manner as Lessee is so obligated. Lessee acknowledges that a sublease includes any form of collocation by any entity on the Premises.

(Original Lease § 10(b).)

In their motion for summary judgment, defendants raise several arguments all focused on showing that their arrangement with CCATT does not constitute "allow[ing] another party's use of the Premises, including the Pole," that would entitle the District "to share [in] the rent, revenue or other consideration" from the AT&T-Crown Castle Transaction.

Although the District insists that CCATT *does* "use" the Premises, the District also argues, in its own dispositive motion, that Section 10(b) is two-pronged, and that defendants are completely ignoring the first prong under which the District is entitled to share in rent, revenue or consideration from "subleas[ing] [of] space on the Premises, including the Pole[.]" The District argues that the arrangement between the defendants and CCATT is a sublease.

The Court will address each motion separately below, but first it will address the underlying contract interpretation. The Court explicitly concludes that Section 10(b) of the Lease is unambiguous because it can be given a definite legal meaning.

In interpreting a contract, a court is "required, if possible, to give effect to every provision of the contract." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011). Here, as properly argued by the District, Section 10(b) has two prongs. The lessee may (1) sublease space on the Premises, including the Pole, **or** (2) allow another party's use of the Premises, including the Pole. Any other construction of Section 10(b) would render the word "or" meaningless. *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008) ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary.").

The second prong (the "use" prong) is narrow and links to Section 3 of the Lease,[16] which grants a license to transmit and receive telecommunications. The first prong (the "sublease" prong) is broader—giving the lessee the right to sublet space, with no purpose or "use" specified. Under both prongs, defendants have the duty to share with the District any rent, revenue or consideration

---

[16] The District claims that "use" is not a defined term in the Lease. The Court rejects that argument and concludes that "use" has the meaning set forth in Section 3 of the Lease.

resulting from the sublease of space on the Premises to a third party or resulting from the use of the Premises by a third party. These two prongs are discussed in more detail below.

**B.      The Cross Motions for Summary Judgment**

The Court now turns to the separate motions for summary judgment[17] to determine whether, given the Court's construction of the Lease, either party is entitled to judgment under Section 10(b).

Defendants' focus is on the "use" prong of the lease. They first assert that CCATT is not an "other party using the Premises[]" because it merely "processes payments and inspects the Tower annually on Tower Holdings' behalf." (MSJ at 3110.) According to defendants, CCATT is contracted to discharge the obligations of Tower Holdings, which the District admits is permissible under the Lease (*see* Nist Dep. at 5317); therefore, CCATT merely acts on behalf of Tower Holdings.

Although "use" is not specifically defined in the Lease, Section 3 provides:

> For the Term set forth herein and subject to the terms and conditions of this Agreement, Lessor hereby grants to Lessee a non-exclusive license to use the Premises for (i) the installation, operation, maintenance, repair, replacement and relocation of all of the Equipment comprising the Cell Site and (ii) for the transmission and reception of communication signals pursuant to all rules and regulations of the Federal Communications Commission ("FCC").

(Original Lease § 3.) Therefore, to be a party "using the Premises" within the meaning of the second prong of Section 10(b), one must be engaged in the two activities licensed under Section 3.

The unrefuted testimony of Vicky Davis, who was, at relevant times, one of the CCATT employees responsible for the District's site[18] (Davis Dep. at 6983; 6994), was that CCATT had

---

[17] The defendants have requested oral argument on their motion, but the Court sees no need to grant that request.

[18] Davis held the title of "real estate specialist." (Davis Dep. at 6981-82.)

no telecommunications equipment on either of the poles at the District's site and conducted no telecommunications operations there. Davis testified that only Verizon, T-Mobile, and AT&T have such equipment at the site. (*Id.* at 6996–97.) CCATT's role was one of maintenance and yearly inspections. (*Id.* at 6990.) Davis described the job responsibilities as including "upkeep of the site, . . . maintenance, . . . making sure that the fence is up . . . spray the compound – inside the compound for weeds, making sure it's clean in there, there's not garbage." (*Id.* at 7012.)[19]

In addition, defendants point out that the revenue intended to be shared under the Lease results from charging rent to cellular companies that collocate equipment on the tower to transmit signals for their cellular network. Defendants argue that the monetization of *their share* of the anticipated future revenue stream from such collocation (as represented by the lump sum payment in excess of $696,000 made by Crown) in return for CCATT's assumption of certain management responsibilities is not "rent, revenue  or other consideration" covered by the revenue sharing provision of the Lease; in other words, the District is not entitled to share in revenue to which it had no right in the first place.

The District counters that this payment by Crown proves that the arrangement was not a true management agreement where Crown would have *received*, not *made*, payment. (MSJ Opp'n at 7728–29; *see also* MPSJ at 4399–400.) The District says this is a sublease "masquerading" as a management agreement, with CCATT masquerading as a manager. (MSJ Opp'n at 7729.) But this arrangement was adequately explained by Viron in his deposition. Viron's unrefuted testimony is

---

[19] Defendants argue that the District expressly approved the managerial arrangement between defendants and CCATT when it executed the Second Amendment, wherein it recognized CCATT as the "attorney in fact" for Tower Holdings, and acknowledged that CCATT "manages and operates the site related to the Lease for Lessee and is obligated to comply with the terms of the Lease." (*See* Second Amendment at 3775.) But this argument is not persuasive since all the language relied upon from the Second Amendment was contained in recital clauses, which, like titles, are "not . . . strictly part of the contract[.]" *Engineered Data Prods., Inc. v. Nova Office Furn., Inc.*, 849 F. Supp. 1412, 1417 (D. Colo. 1994) (quoted by *Fox v. Fox*, No. 01AP-83, 2002 WL 722804, at *7 (Ohio Ct. App. Apr. 25, 2002)).

that the $696,247 paid by Crown to AT&T in a lump sum represented the "value of [the] asset" underlying the management agreement at "a point in time[.]" (Viron Dep. at 2337.) This value incorporated "the rev[enue] share that's paid to North Canton under [section] 10(b) [of the Lease]," the amounts anticipated from the collocators (T-Mobile and Verizon), anticipated ground rent, and costs, calculated "over a period of time[.]" (*Id.* at 2336–37.) In other words, in exchange for gaining AT&T's right, rather than having the manager pay AT&T month-by-month over the period of the management agreement, the value of defendants' share was calculated in advance and paid by Crown in one agreed-upon lump sum, which Crown would recoup over time. It is not difficult to see how this method would have benefited both parties—giving AT&T a one-time infusion that it could immediately use, and saving the manager from performance of a monthly administrative task. This arrangement, which has not been refuted by the District, does not destroy the "management" nature of the agreement.

The Court concludes that the revenue sharing provision in Section 10(b) of the Lease relating to "use" of the premises was not triggered by the AT&T-Crown Castle Transaction because CCATT is not itself "using" the premises to transmit telecommunications, but has merely stepped into the shoes of defendants to perform certain tasks relating to defendants' (and the collocators') use of the Premises. To that extent, defendants are entitled to summary judgment on the breach of contract claim.

The District moves for summary judgment under both prongs of Section 10(b). To the extent the Court has already determined that the defendants are entitled to summary judgment under the second prong (the "use" prong), the District's motion is denied.

The District also claims, under the first prong of Section 10(b) (the "sublease" prong), that "[t]he Management Agreement between [d]efendants and CCATT is, as a matter of law, actually

a sublease[]" because Tower Holdings "transfer[ed] an interest in the premises that is less than its entire estate for the balance of the lease term (retains a reversionary interest), and the agreement gives the right of possession and the exclusive occupation of the land." (MPSJ at 4390–91.) Therefore, the District asserts that, although defendants are permitted to "sublease space on the Premises, including the Pole," they must "share the rent, revenue or other consideration received from any sublessee" consistent with the percentages set forth in the Lease. (Original Lease § 10(b).) The District argues that, under Ohio law, the title of an agreement (such as "management" agreement) is not dispositive, and "the Court must look to the rights and obligations that the agreement confers to determine its true nature." (MPSJ at 4401 (citing *Tillimon v. Hasan*, No. L-03-1066, 2004 WL 291161, at *2 (Ohio Ct. App. Feb. 13, 2004) (citing *Joseph Bros. Co. v. F.W. Woolworth Co.*, 844 F.2d 369, 372 (N.D. Ohio 1988) (if a lessee transfers less than his entire estate for the balance of the term of the lease, it is a sublease).)[20]

In opposition, the defendants argue that the District already contractually agreed that CCATT is a manager, not a sublessee, when the District entered into the Second Amendment, which specifies that "CCATT manages and operates the site related to the Lease for Lessee[.]" (MPSJ Opp'n at 7452, quoting Second Amendment, emphasis omitted.) Furthermore, the defendants assert that, although there is a difference under Ohio law between an assignment of a lease and a sublease, both require that *some* property interest is transferred. Defendants assert that CCATT has no property interest in the Premises, which is fatal to any claim that CCATT is a

_____

[20] The District also argues that the final sentence of Section 10(b) buttresses its interpretation that CCATT is a "collocator" on the Premises. The District rejects application of the definition of "collocation" found in the North Canton Zoning Ordinance, arguing that it is extrinsic to the Lease. The Court concludes that the zoning code definition of "collocation" *is* applicable to the Lease because the parties were required to comply with the zoning code to obtain a conditional use permit.

sublessee. (*Id.* at 7453–54, citing cases.) Defendants claim that the District is "gloss[ing] over this point by insisting that any transfer of less than an entire estate is a sublease." (*Id.* at 7454.)

Defendants have the correct view here. A transfer is not a sublease if the original lessee (Tower Holdings here) retains its property interest and transfers only property-management-related contractual rights and obligations to a third party (CCATT here). Numerous courts have recognized this. (*Id.* at 7454–55, citing cases.)

But even more determinative, in the Court's view, is the actual language of the "sublease" prong of Section 10(b), which says that the lessee (Tower Holdings) "may sublease *space* on the Premises, including the Pole[.]" (Original Lease § 10(b), emphasis added.) "Premises" is defined as follows:

> space measuring approximately (to be determined by the parties) [sic] on the ground in an agreed-upon location behind the scoreboard of the North Canton High School football field upon which Lessee shall install the Pole and a Fiberbond building (the "Shelter").

(*Id.* § 1(F).)[21] The Original Lease, therefore, leased a certain patch of land (the "Premises") to Tower Holdings and, under the "sublease" prong of the Section 10(b), provided that, should Tower Holdings sublease *space* to someone else, it must share the revenues with the District.

This prong of the Original Lease is in addition to the "use" prong. It covers other subletting of the space that comprises the Premises, including any Pole on the Premises. So, for example, Tower Holdings could have sublet a corner of the Premises for someone to build a storage shed and, in that case, any rent paid would have to be shared with the District. Or, as another example,

---

[21] In the District's opposition to the defendants' motion, it represents that "[t]he size of the Premises under the original Lease was 3,111 square feet and for the second Premises added an additional 2,267 square feet." (Opp'n MSJ at 7732 & n.6 (citing Lease and Exs. A, B; First Amendement and Exs. A,B).) The Court has no reason not to accept this as true, but it cannot be confirmed by looking at the cited exhibits, which are too small and indistinct to read at that level of detail.

Tower Holdings could have sublet space on the Pole located on the Premises for someone to install a billboard to advertise a business and, in that case, any rent paid would also have to be shared with the District. Or, for that matter, Tower Holdings could have sublet space on the Premises for "uses that go beyond [the] cell tower[,]" such as "Wi-Fi and WiMAX and . . . Internet and the broadband," (Doc. No. 90-1, Deposition of Terry Moore[22] ("Moore Dep.") at 2130), which are not, strictly speaking, "wireless telecommunications" covered by the "use" prong.[23] As Moore explained, Tower Holdings "indicated there could be a lot of future uses on the premises . . . not necessarily on the pole. On the premises. . . . And [the District] wanted to receive any revenue that [Tower Holdings] received[.]" (*Id.*)

The Court concludes that the revenue sharing provision in Section 10(b) of the Lease relating to "sublease" of the premises was not triggered by the AT&T-Crown Castle Transaction because CCATT is not subleasing space on the Premises. There is nothing in this record to suggest that CCATT has any physical presence on the Premises or on the Pole. Therefore, the District is not entitled to summary judgment and, in fact, the defendants are entitled to summary judgment as to the "sublease" prong of Section 10(b) and the same will be granted.[24]

---

[22] Terry Moore is an attorney whose law firm has represented the District and who himself served on the school board from 2004 to 2008. (Moore Dep. at 2032–33.)

[23] These are merely illustrative examples. The Court has no idea whether zoning ordinances would permit this.

[24] Strictly speaking, the defendants have not moved for summary judgment on the first prong of Section 10(b), having apparently not viewed Section 10(b) as two-pronged. That said, "[t]here is no per se prohibition on entering summary judgment[] *sua sponte*." *Emp'rs. Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995). District courts "'are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party *was on notice that [it] had to come forward with all of [its] evidence.*'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 326) (emphasis added in original). The "totality of the circumstances" must be considered, in particular, "whether the prevailing party moved for summary judgment; whether the losing party moved for summary judgment; what issues the parties focused on in their briefs; what factual materials the parties submitted to the court; and whether motions were filed by co-defendants." *Turcar, LLC v. I.R.S.*, 451 F. App'x 509, 513 (6th Cir. 2011) (citing *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959–60 (6th Cir. 2007)). Here, the totality of the circumstances permits a grant of summary judgment in the defendants' favor on Section 10(b) in its entirety because, on the cross-motions for

## C. Additional Matters

One last issue must be explicitly discussed. In its motion for partial summary judgment, the District claims it has "preserved for trial[] . . . [o]ther breaches of Section 10(b) of the Lease by [d]efendants and other sublessees/users of the [District's] site learned of through discovery in this case." (MPSJ at 4390.) In particular, the District asserts that it has preserved a claim of breach relating to the amounts received from Verizon/New Par. (*Id.* at 4390 n.2.) Further, in its brief in opposition to the defendants' motion, the District also argues that it preserved a claim that its portion of the collocator amounts has been significantly underpaid. (MSJ Opp'n at 7727.)

The FAC was filed on April 3, 2017, after this Court dismissed Count One as to AT&T and Counts Two, Four and Five as to all defendants. Fact discovery ended on September 19, 2018, after three extensions of the original December 4, 2017 deadline were granted, and a fourth requested extension was denied. Between September 19, 2018 and February 4, 2019, when the dispositive motions were due, plaintiff made no request to file a second amended complaint or to otherwise clarify that, in its view, its breach of contract claim was broader than the facts arising under the relevant AT&T-Crown Castle Transaction—the only facts alleged in the FAC and the only claim raised in Count One. (*See generally*, FAC ¶¶ 63–72; *see specifically* FAC ¶ 66 ("Despite the [District's] demand for payment and notice of default, [defendants] have refused to remit payment to the [District] for the revenue or other consideration that AT&T received from Crown."); Prayer for Relief (a) (seeking as to the breach of contract claim, damages, late fee, and interest "on the unpaid amounts from the date that Crown paid AT&T under the AT&T-Crown Transaction, plus attorneys' fees, expert fees, costs of suit, and court costs").)

---

summary judgment, each side had "an opportunity and an incentive to present all of its evidence and arguments[,]" *Aubin Indus., Inc. v. Smith*, 321 F. App'x 422, 423 (6th Cir. 2008), and clearly did so.

The District has not properly preserved any "other breaches" and, liberal pleading standards do not apply "[o]nce a case has progressed to the summary judgment stage[.]" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that a plaintiff could not raise a new claim in response to a summary judgment motion)).

Nor need this Court consider any unmade request for leave to amend yet again. *See generally Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (setting forth factors to consider in determining whether to permit an amendment, including: undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment). This case has been hard-fought from the outset, with the parties disagreeing virtually every step of the way, requiring considerable judicial resources, including referrals to a magistrate judge for resolution of discovery disputes. There was nothing to prevent the District from seeking leave to file a second amended complaint as soon as it discovered "new" claims and/or allegations.

At the very least, the District should have sought such leave during the time it was preparing its summary judgment motion and/or its response to the defendants' summary judgment motion, where it declared that it has "preserved" this late-discovered issue. In both of those documents, the District admits that it believed it had uncovered new claims during discovery—a virtual concession that such claims were not contained in the FAC. Yet, the District did not act or otherwise seek the guidance of the Court, despite its previous proclivity for doing so. (*See, e.g.*, Doc. Nos. 11, 40, 64, 69, 81.)

It is too late for the District to declare that it has preserved for trial matters unpled. To the extent it claims to have done so, the Court explicitly rejects that assertion.

20

## V.       CONCLUSION

For the reasons set forth herein, plaintiff's motion for partial summary judgment (Doc. No.

95) is denied and defendants' motion for summary judgment (Doc. No. 93) is granted. Case closed.


**IT IS SO ORDERED**.

Dated: July 3, 2019

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**